Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

In re Pfizer Inc. Securities Litigation
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
In re PFIZER INC. SECURITIES LITIGATION
**No. 90 Civ. 1260 (SS).**

Dec. 23, 1993.

MEMORANDUM AND ORDER

BUCHWALD, United States Magistrate Judge.
**\*1** This discovery dispute arises in the context of a class action suit brought by purchasers of Pfizer Inc. ("Pfizer") common stock during the period from March 24, 1989 through February 26, 1990 (the "class period"). Plaintiffs' Consolidated Amended Complaint, filed July 13, 1990, alleges that Pfizer and seven of its officers violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, by failing to disclose the true extent of the company's financial exposure from tort claims involving a mechanical heart valve manufactured by Shiley, Inc. ("Shiley"), a wholly-owned subsidiary. Plaintiffs further allege that defendants, in their public disclosures to the Securities and Exchange Commission ("SEC") and the investing public during the class period, falsely asserted that Pfizer's existing reserves and insurance were adequate to cover any loss incurred from heart valve litigations.

Presently before this Court is plaintiffs' motion to compel production of 1219 documents believed to demonstrate Pfizer's awareness of its potential losses. Defendants have withheld or redacted the documents on either attorney-client or work product privilege grounds, or a combination thereof.[FN1]

BACKGROUND

Pfizer, a Delaware corporation, is a researched-based company operating worldwide in a number of business areas, including pharmaceuticals, medical devices, and surgical equipment. Pfizer sold approximately 86,000 mechanical heart valves (formally known as the "Bjork-Shiley Covexo-Concavo heart valve" or the "C/C heart valve") worldwide between 1979 and 1986 before removing them from the market because of product defects. In their Consolidated Amended Complaint, plaintiffs estimate that the valve remains implanted in nearly 60,000 people. It is also alleged that hundreds of lawsuits have been filed against Pfizer to recover for the mental anguish of living in fear of valve fractures ("prefracture cases") and for the actual deaths caused by valve fractures ("postfracture cases"). Plaintiffs assert that defendants recognized, but failed to disclose to investors or shareholders at any time during the class period, the material exposure to Pfizer associated with the prefracture and postfracture heart valve cases. In particular, plaintiffs claim that Pfizer's Forms 10-K for the years ended December 31, 1986, December 31, 1987, December 31, 1988; its Form 10-Q for the third quarter of 1987 and for the quarters ended April 2, 1989, July 2, 1989, and October 1, 1989; and its Annual Reports to Shareholders on Form SE for the years ended December 31, 1987 and December 31, 1988 contained a combination of material misstatements, omissions, and misleading disclosures with respect to the true nature and severity of the heart valve defects and the financial exposure therefrom.

In the instant dispute, plaintiffs ask that this Court direct Pfizer to produce over twelve hundred documents, which the parties have together grouped into the following four categories:

**\*2** (1) Documents relating to reserves for the individual heart valve litigations. This category, containing 1114 documents, is by far the largest of the four.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 2 of 15

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

(2) Correspondence between Pfizer and its insurers relating to insurance coverage for the heart valve litigations and claims. This category includes 197 documents.

(3) Documents constituting communications from Pfizer or Shiley employees who are not attorneys to attorneys employed by or retained by Pfizer or Shiley for their review relating to regulatory issues or mailings to the medical community concerning the heart valve.

(4) Documents that reflect the view of Pfizer as to the adequacy of insurance coverage for the heart valve litigations and claims.

In the course of deciding this dispute, we have reviewed *in camera* a large sample of documents from categories (1) and (2), and all the documents from categories (3) and (4).

This dispute involves some of the more difficult and debated issues in the law of attorney-client and work product privilege.[FN2] We will undertake our analysis of this discovery dispute in two steps. Taking each of the four categories separately, we begin with the question of whether the documents meet the narrow requirements of either the attorney-client or work product privileges. Assuming they do, we will then examine whether plaintiffs are nonetheless entitled to their production on the basis of the "good cause" doctrine of *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970), *cert. denied,* 401 U.S. 974 (1971), or the "substantial need and undue hardship" exception to ordinary work product, Fed.R.Civ.P. 26(b)(3).

As an initial matter, we note that Pfizer bears the burden of establishing the facts that demonstrate the existence of the attorney-client or work product privileges. *See von Bulow v. von Bulow,* 811 F.2d 136, 144 (2d Cir.) (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984,* 750 F.2d 223, 224 (2d Cir.1984)), *cert. denied,* 481 U.S. 1015 (1987); *In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867 (1973). "That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonanno,* 344 F.2d 830, 833 (2d Cir.1965). Furthermore, Pfizer also has the burden of establishing non-waiver of the privilege. *See Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 191 (S.D.N.Y.1988).

DISCUSSION

I. *Applicability of the Attorney-Client and Work Product Privileges to the Four Categories of Documents*

(1) *Category One: Documents Related to Reserves for the Individual Heart Valve Litigations*

Defendants argue that all the documents within category one are protected as work product because they reflect the impressions, thoughts, conclusions, or evaluations of Pfizer's attorneys with respect to reserves for individual heart valve litigations and claims. In addition, defendants believe that many of the same documents also qualify for protection under the attorney-client privilege.

**\*3** According to defendants, the documents were created pursuant to the controller division's ongoing responsibility to monitor Pfizer's reserves for heart valve litigations. It is alleged that this information was then used by Pfizer's legal department to develop litigation strategies, to advise the Board of Directors and management about the company's financial exposure, and to satisfy disclosure obligations pursuant to the federal securities laws.

In contrast, plaintiffs contend that *all* the documents in this category were created "for the business purpose of public reporting" and were provided to Pfizer's outside auditor, KPMG Peat Marwick ("Peat Marwick"), and/or to Pfizer's shareholders. (Pls.'s Suppl.Br. at 7.) Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 3 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 3

concede that while this "indisputably" was one of the purposes for preparing the documents, "that was the case only in the broadest sense that the federal securities laws require that *all* public corporations must report material pending legal proceedings (and thus consider the effect of reserves that have been taken for these legal proceedings) in public filings." (Defs.'s Answering Post-Privilege Disc.Mem. at 12.) In the view of defendants, because documents related to individual reserves inevitably reflect the mental impressions of Pfizer's attorneys, it is immaterial that the legal advice may also have been used to comply with public disclosure obligations. Furthermore, defendants assert that Pfizer's shareholders never had access to *any* of the documents in dispute and that Peat Marwick received many of them, but certainly not all.

The vigorous debate between the parties over the intended use of the documents reflects the centrality of this characterization to the applicability of the claimed privileges. The determination of whether a given document constitutes legal or business advice does not lend itself to a bright-line test for the two are often "inextricably interwoven." *Hercules v. Exxon,* 434 F.Supp. 136, 147 (D.Del.1977). *Accord United States v. Willis,* 565 F.Supp. 1186, 1190 (S.D.Iowa 1983); *In re Grand Jury,* 561 F.Supp. 1247, 1258 (E.D.N.Y.1982). Nonetheless, the applicability of the attorney-client privilege may rest on this sometimes subtle distinction. Likewise, while a fundamental condition for work product privilege to apply is that the documents were created "in anticipation of litigation," *Hickman v. Taylor,* 329 U.S. 495, 511-12 (1947); Fed.R.Civ.P. 26(b)(3), there are few definite standards for courts to follow.

Recognizing that documents may be created for more than one purpose, the threshold issue as to the applicability of work product protection has been described as requiring an inquiry into "the primary motivational purpose behind the creation of the document." *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir.), *cert. denied,* 454 U.S. 862 (1981). *Accord Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1119 (7th Cir.1983) (quoting *Janicker v. George Washington Univ.,* 94 F.R.D. 648, 650 (D.D.C.1982)); *Barrett v. United States Banknote Corp.,* No. 91 Civ. 7420, 1992 U.S.Dist. LEXIS 9980, at *3 (S.D.N.Y. July 6, 1992); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 644 (S.D.N.Y.1987). If the primary motivating purpose is other than to assist in pending or impending litigation, then the document does not receive work product protection. *See United States v. Gulf Oil Corp.,* 760 F.2d 292, 296 (Temp.Emer.Ct.App.1985).

**\*4** On the basis of our review of the relevant caselaw and our *in camera* examination of certain documents, we conclude that the primary motivating purpose behind the communications concerning individual case reserves was preparation for litigation. The reserve figure set for an individual case reflects an attorney's professional opinion as to the value of the tort claimant's suit. In this specific context of litigation over defects in a mechanical heart valve, a reserve figure could reveal Pfizer's view about, *inter alia* (1) the strength of a plaintiff's case, (2) the extent of the design defect, (3) the applicability of an affirmative defense, (4) the potential settlement value, and (5) in a prefracture case, the likelihood of valve rupture. These are typical examples of opinion work product. Unlike ordinary work product, which is discoverable upon a showing of "substantial need" and "undue hardship," Fed.R.Civ.P. 26(b)(3), opinion work product "is accorded almost absolute protection from discovery because any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases." *Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir.), *cert. denied,* 474 U.S. 903 (1985). *See also In re Sealed Case,* 676 F.2d 793, 809-10 (D.C.Cir.1982) (asserting that discovery of opinion work product requires "extraordinary justification"); *In re John Doe Corp.,* 675 F.2d 482, 492-93

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 4 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))

Page 4

(2d Cir.1982) (indicating that mental processes and legal theories are "entitled to the greatest protection available under the work-product immunity").[FN3]

Although plaintiffs insist that all the documents in this category were created for the business purpose of public reporting rather than in anticipation of trial, we do not believe that, as a practical matter, a document describing individual case reserves provides meaningful information for preparing such a disclosure. An estimate of financial exposure in any individual case does not furnish a board of directors or management with a sufficiently comprehensive picture to make a business forecast or public disclosure. In order for an estimate about an individual case to form the basis of a forecast or disclosure in the context of mass tort litigation, the board of directors and management would likely also need to know such factors as (1) how many similar cases the company faces; (2) the extent and coverage of the company's insurance; (3) over what period of time, and at what rate, the company should expect suits; (4) the predicted rate of inflation; and (5) the impact of early settlements on the company's ability to afford paying equivalent sums at a later point in time.

By contrast, a document containing aggregate information compiled from individual case reserve figures would serve mainly business purposes-namely, to apprise the board of directors and management of Pfizer's current financial exposure from pending and impending tort claims and to prepare public filings to the SEC. The information embedded in an aggregate reserve figure is too generalized to be useful for planning litigation strategy in any specific case. Consequently, aggregate reserve figures do not constitute work product.[FN4]

*5 In *Simon v. G.D. Searle,* 816 F.2d 397 (8th Cir.), *cert. denied,* 484 U.S. 917 (1987), the Eighth Circuit confronted the question presented, namely how to classify documents describing individual and aggregate case reserves for work product purposes. That court held that documents describing individual case reserves were privileged under the work product doctrine, but that documents containing calculations of aggregate case reserves were not. The Eighth Circuit reasoned that individual case reserve figures reflect an attorney's estimate of anticipated legal expenses, settlement value, length of time to resolve the litigation, geographic inconveniences, and other factors-in short, classic considerations in deciding upon a litigation strategy. "The individual case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product." *Id.* at 401. On the other hand, an aggregate reserve figure, which incorporates numerous additional factors, disguises individual figures so as to protect against disclosure of work product. In the words of the Eighth Circuit:

The individual figures lose their identity when combined to create the aggregate information. Furthermore, the aggregates are not even direct compilations of the individual figures; the aggregate information is the product of a formula that factors in variables such as inflation, further diluting the individual reserve figures. Certainly it would be impossible to trace back and uncover the reserve for any individual case, and it would be a dubious undertaking to attempt to derive meaningful averages from the aggregates, given the possibility of large variations in case estimates for everything from frivolous suits to those with the most serious injuries. The purpose of the work product doctrine-that of preventing discovery of a lawyer's mental impressions-is not violated by allowing discovery of documents that incorporate a lawyer's thoughts in, at best, such an indirect and diluted manner.

*Id.* at 402.

Apparently conceding the merit of this argument, defendants assert that plaintiffs have already been provided with all documents revealing aggregate information. However, having reviewed a sample of these documents *in camera,* we do not accept the extremely narrow criteria that defendants appear to

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 5 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 5

have adopted for defining what constitutes an aggregate reserve figure. We believe that many of the documents that defendants identify as related to individual case reserves are not properly so characterized. Rather, they belong in the category of aggregate information and should *not* be withheld.

For example, defendants have refused to provide a year-by-year breakdown of product liability claims, apparently on the grounds that this would reveal information about individual case reserves. In fact, the total dollar value of claims in any given year suggests no meaningful information at all about legal strategy in an individual litigation. Therefore, a document that details the total cost to Pfizer of tort claims by year, or even by month, belongs in the non-privileged category of aggregate information. In contrast, a document that lists *by name* the cost to Pfizer of particular litigations within a given year *does* reveal individual information and, as such, is privileged.[FN5]

**\*6** Turning to the attorney-client communications, once again the applicability of the privilege to correspondence from attorney to corporate client depends on whether the subject matter was individual or aggregate case reserves. For the reasons stated above with respect to the work product doctrine, we believe that documents containing aggregate information are not "predominantly concerned" with conveying legal advice, *Status Time Corp. v. Sharp Electronics Corp.,* 95 F.R.D. 27, 31 (S.D.N.Y.1982), and are not therefore entitled to attorney-client privilege protection. *See also SCM v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.1976) ("When the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected because legal considerations are also involved."). On the other hand, documents containing individual case reserve figures are predominantly legal in nature. Therefore, those are privileged assuming the information on which the documents were based was kept confidential by Pfizer. *See Mead Data Central, Inc. v. United States Dept. of the Air Force,* 566 F.2d 242, 254 (D.C.Cir.1977).

Because none of the memoranda from corporate client to counsel appears to contain explicit legal questions, the only apparent ground for privilege is that the communications embodied "an implied request for legal advice based thereon." An implied request exists when an employee sends information to corporate counsel in order to keep them apprised of ongoing business developments, with the expectation that the attorney will respond in the event that the matter raises important legal issues. An implied request is privileged to the same extent as an explicit request. *See Amcast Indus. Corp. v. Detrex Corp.,* No. 588-620, 1991 U.S.Dist. LEXIS 20885, at \*5 (N.D.In. July 26, 1991); *Pizza Management, Inc. v. Pizza Hut, Inc.,* No. 86-1664-C, 1989 U.S.Dist. LEXIS 1106, at \*12 (D.Kan. Jan. 9, 1989); *Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 136, 144 (D.Del.1977); *Jack Winter, Inc. v. Koratron Co.,* 54 F.R.D. 44, 46 (N.D.Cal.1971). Because data about specific litigations in the past could be valuable in rendering legal advice as to appropriate strategy for similar suits in the future, we hold that documents describing individual cases are protected by attorney-client privilege, but that, once again, documents containing aggregate information are not.

We now turn to the issue of waiver. Plaintiffs assert that Pfizer waived any otherwise applicable privilege by disclosing the documents to its independent auditor, Peat Marwick, and/or to its shareholders. Preliminarily, we note that no evidence has been submitted to us to support plaintiffs' allegation that Pfizer disclosed some of the documents in question to shareholders. Thus, we will only consider the possibility of waiver as a consequence of deliberate disclosure to the independent auditor.

The work product privilege is not automatically waived by any disclosure to third persons. *In re Sealed Case,* 676 F.2d at 809. Rather, the courts generally find a waiver of the work product privilege only if the disclosure "substantially increases the opportunity for potential adversaries to obtain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 6 of 15

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

the information." *In re Grand Jury,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982). *Accord In re Steinhardt Partners,* No. 93-3079, 1993 U.S.App. LEXIS 28979, at *13 (2d Cir. Nov. 8, 1993); *In re Doe,* 662 F.2d 1073, 1081 (4th Cir.1981), *cert. denied,*455 U.S. 1000 (1982); *United States v. AT & T,* 642 F.2d 1285, 1299 (D.C.Cir.1980); *Grumman Aerospace Corp. v. Titanium Metals Corp.,* 91 F.R.D. 84, 89 (E.D.N.Y.1981); *GAF Corp. v. Eastman Kodak Co.,* 85 F.R.D. 46, 51 (S.D.N.Y.1979); *American Standard, Inc. v. Bendix Corp.,* 71 F.R.D. 443, 446 (W.D.Mo.1976). Disclosure of work product to a party sharing common interests is not inconsistent with the policy of privacy protection underlying the doctrine. *See Stix Prods. v. United Merchants & Mfrs.,* 47 F.R.D. 334, 338 (S.D.N.Y.1969) ("The work product privilege should not be deemed waived unless the disclosure is inconsistent with maintaining secrecy from possible adversaries."). Therefore, in *Gramm v. Horsehead Indus., Inc.,* No. 87 Civ. 5122, 1990 U.S.Dist. LEXIS 773 (S.D.N.Y. Jan. 25, 1990), the court held that defendants did not waive their work product privilege to a document transmitted to the company's outside auditors, because such a disclosure "cannot be said to have posed a substantial danger at the time that the document would be disclosed to plaintiffs." *Id.* at *15. Likewise, in this case, Pfizer and Peat Marwick obviously shared common interests in the information, and Peat Marwick is not reasonably viewed as a conduit to a potential adversary. Therefore, no waiver of work product protection occurred by the provision of these documents to Peat Marwick.

**\*7** However, as defendants acknowledge, Pfizer cannot assert attorney-client privilege for any documents that were provided to its independent auditor. Disclosure of documents to an outside accountant destroys the confidentiality seal required of communications protected by the attorney-client privilege, notwithstanding that the federal securities laws require an independent audit. "Confidentiality as to these documents is neither expected nor preserved, for they are created with the knowledge that independent accountants may need access to them to complete the audit." *United States v. El Paso Co.,* 682 F.2d 530, 540 (5th Cir.1982), *cert. denied,*466 U.S. 944 (1984). *See also In re John Doe Corp.,* 675 F.2d 482, 489 (2d Cir.1982). Additionally, the communications between Pfizer and Peat Marwick are not independently protected under an accountant-client privilege, as such a privilege is not recognized by the federal courts. *Couch v. United States,* 409 U.S. 322, 335 (1973) ("no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases"). *See also* 2 Jack A. Weinstein & Margaret B. Burger, *Weinstein's Evidence* ¶ 503(a)(3)[01], at 503-24 (1993).[FN6]

(2) *Category Two: Correspondence Between Pfizer and Its Insurers Relating to Insurance Coverage for the Heart Valve Litigations and Claims*

Defendants claim that although the documents in this category constitute correspondence between Pfizer and its insurance carriers, they are nonetheless protected by both the attorney-client and work product privileges because they reflect legal strategy relating to insurance coverage and/or the underlying heart valve litigations. In particular, they maintain that certain documents divide claims into specific policy years and, as a result, reveal estimates made by Pfizer's counsel as to when particular heart valve actions accrued. Defendants further assert that the transmission of documents to the insurance carriers did not result in a waiver. By contrast, plaintiffs argue that the documents were not prepared for reasons of legal strategy, but for the business purpose of negotiating with Pfizer's insurance carriers over claims coverage.

In determining whether communications between an insured and an insurer ought to receive protection within the framework of the attorney-client privilege, we find the D.C. Circuit's careful analysis in *Linde Thomson Langworthy Kohn & Van Dyke v. Resolution Trust Corporation,* No. 93-5131, 1993 U.S.App. LEXIS 25279 (Oct. 5, 1993), highly per-

Case 1:07-cv-04137-BSJ-GWG    Document 62-2    Filed 07/17/2008    Page 7 of 15

Not Reported in F.Supp.    Page 7
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

suasive. In *Linde Thomson,* Judge Wald flatly rejected the notion that there is an attorney-client privilege in insured-insurer communication, reasoning as follows:

An insured may communicate with its insurer for a variety of reasons, many of which have little to do with the pursuit of legal representation or the procurement of legal advice. Certainly, where the insured communicates with the insurer for the express purpose of seeking legal advice with respect to a concrete claim, or for the purpose of aiding an insurer-provided attorney in preparing a specific legal case, the law would exalt form over substance if it were to deny application of the attorney-client privilege. However, a statement betraying neither interest in, nor pursuit of, legal counsel bears only the most attenuated nexus to the attorney-client relationship and thus does not come within the ambit of the privilege.

**\*8** *Id.* at \*19-20. In the category two documents, Pfizer's communications are for the purpose of seeking insurance coverage, not legal advice, from its carriers. As such, they do not fall within the scope of the attorney-client privilege.

Furthermore, even without the benefit of the D.C. Circuit's decision in *Linde Thomson,* we would reject defendants' claim of attorney-client privilege on the fundamental ground that disclosure to an insurer is no different than disclosure to an independent auditor-both waive the attorney-client privilege. To avoid this conclusion, defendants urge the Court to find non-waiver on the theory that an insured and an insurer "share a common interest about a legal matter" that "protect[s] the free flow of information." *United States v. Schwimmer,* 892 F.2d 237, 243-44 (2d Cir.), *cert. denied,* 112 S.Ct. 55 (1991). Defendants have read this case and the others cited in their brief too broadly. The decision in *Schwimmer* protected certain communications between a party and the accountant hired by the attorney of another party with a mutual interest in the litigation by reference to the "joint defense privilege" (also known as the "common interest rule"). There was no discussion of an insured-insurer privilege in any context. The *Schwimmer* court explained that the joint defense privilege "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* at 243. In this case, there is simply no evidence, and defendants do not so contend, that Pfizer and its insurance carriers have agreed to act as partners in a single unified litigation strategy. Accordingly, an argument based on the joint defense privilege is inapplicable.

Nonetheless, there is merit in defendants' contention that disclosure of work product by an insurer to an insured does not waive work product privilege for the same reasons that disclosure of work product to an outside auditor is not a waiver. Thus, we agree that as long as the documents reflect information about individual case reserves, which is otherwise protected by work product privilege, and not information about aggregate case reserves, which is not, then the disclosure of the documents to an insurance carrier will not operate as a waiver.

(3) *Category Three: Documents Constituting Communications from Pfizer or Shiley Employees Who Are Not Attorneys to Attorneys Employed By or Retained By Pfizer or Shiley For Their Review Relating to Regulatory Issues or Mailings to the Medical Community Concerning the Heart Valve*

Category three includes five documents described by the parties as communications from Pfizer/Shiley employees to Pfizer/Shiley attorneys relating to regulatory issues or mailings to the medical community concerning the heart valves.[FN7] Defendants claim that each document satisfies the requirements for attorney-client privilege.

(i) *Priv. Nos. 1691 & 1704 (Identical Documents)*

**\*9** These documents contain a cover letter from a Pfizer/Shiley employee to three other employees,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 8 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 8

one of whom was an attorney, followed by a copy of internal notes and memos from the Food and Drug Administration ("FDA"). We hold that the cover letter is privileged, but that the FDA notes and memos are not.

We deem the cover letter to be privileged as an implied request for legal advice. However, the FDA notes and memos accompanying the letter are not protected because they represent pre-existing documents that do not become privileged simply by virtue of being transferred to an attorney. "Documents created by and received from an unrelated third party and given by the client to his attorney in the course of seeking legal advice do not thereby become privileged." *In re Grand Jury Subpoena,* 959 F.2d 1158, 1165 (2d Cir.1992). *See also Fisher v. United States,* 435 U.S. 391, 403-04 (1976) ("pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice"); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 515 (D.Conn.1976) ( "legal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality").

(ii) *Priv. No. 1692*

This document seeks advice and approval from a number of Pfizer/Shiley employees, including Pfizer's Senior Assistant General Counsel, Daniel P. Cronin. The communication satisfies any of the classic privilege tests. *See, e.g., United States v. United Shoe Machinery,* 89 F.Supp. 357, 358-59 (D.Mass.1950). Privilege is not defeated by the fact that the communication was distributed to nine Pfizer/Shiley employees who were not attorneys because (1) the author intended for the correspondence to remain strictly confidential at all times, and (2) the circulation was limited to employees with a need to know the information contained therein. *See generally* John W. Gergacz, *Attorney-Corporate Client Privilege* ¶ 1.04, at 1-13 (2d ed. 1990).

(iii) *Priv. No. 1695*

This document, which requests legal advice from Daniel Cronin, is protected by attorney-client privilege.

(iv) *Priv. No. 1698*

The cover letter in question, which seeks legal advice from Marvin Frank and Robert Ross, is protected by attorney-client privilege.

(d) *Category Four: Documents That Reflect the View of Pfizer as to the Adequacy of Insurance Coverage for the Heart Valve Litigations and Claims*

The final category includes three documents related to Pfizer's insurance coverage for heart valve litigations. Defendants assert that all three are protected by both attorney-client and work product privilege.

(i) *Priv. No. 1216*

This document is a memo written by the director of Pfizer's Corporate Risk Management Department, Harvey R. Molloy, to the company's vice chairman, Jean-Paul Valles. Defendants assert that the memo was a response to a question raised by Pfizer's legal department, and is therefore privileged.

***10** We disagree with this characterization. The memo discusses an issue of risk management that is purely a business decision-whether the cost of a certain litigation is worth the potential gain resulting from a victory in court. Accordingly, we find that this memorandum was assembled in the ordinary course of business and that it does not qualify for the work product privilege under Fed.R.Civ.P. 26(b)(3). Indeed, the Eighth Circuit took the same position in the *Searle* case, which defendants have cited extensively in support of their position as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 9 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 9

how the Court should treat individual case reserves with respect to discovery. In *Searle,* the court found certain risk management documents to be "in the nature of business planning documents," noting that the "risk management department was not involved in giving legal advice or in mapping litigation strategy in any individual case." 816 F.2d at 401. "A business corporation may engage in business planning on many fronts, among them litigation." *Id.* That is the case here with this document.

Furthermore, because Pfizer's vice chairman was neither an attorney nor a subordinate to one, this communication is not protected by attorney-client privilege either. Cf. *Fine v. Facet Aerospace Products Co.,* 133 F.R.D. 439, 444 (S.D.N.Y.1990) (finding that a risk management report was not protected by attorney-client privilege even though the analysis was aimed at reducing litigation costs). Thus, document Priv. No. 1216 is discoverable.

(ii) *Priv. No. 1239*

This document, which is a memorandum from Pfizer's General Counsel Paul S. Miller to another Pfizer attorney (Stephen C. Kany) concerning the Corporate Management Committee's authorization of negotiations on behalf of Pfizer with certain insurance companies, is privileged as an attorney-client communication, though not as work product. Defendants base their claim of attorney-client privilege on the assertion that Mr. Miller sent the memorandum (1) to inform Mr. Kany of the Corporate Management Committee's decision on a subject upon which the legal department had earlier opined; and (2) to instruct Mr. Kany about how to proceed with the underlying legal issue. (Kany Aff. ¶ 3.) In this scenario, the Corporate Management Committee was the client and Mr. Kany its attorney; the communication accordingly is entitled to the benefit of the attorney-client privilege.

However, this document is not entitled to additional protection under the work product doctrine because it does not reveal litigation strategy in any individual case. Rather, the subject matter resembles an aggregate reserve estimate prepared for business purposes. The document simply makes no revelation about any particular case or case strategy.

(iii) *Priv. No. 1441*

This document, a letter between two Pfizer non-attorneys created at the direction of a Pfizer attorney, describes the company's product liability losses in the aggregate and is therefore not protected by work product. Likewise, although the letter's author acted at the direction of an attorney, the information was not predominantly legal in nature and hence does not satisfy the requirements of attorney-client privilege. Rather, the information contained in the letter suggests that the attorney was acting more in the capacity of business adviser than legal counsel. *See General Foods Corp. v. The Jay V. Zimmerman Co.,* No. 86 Civ. 2697, 1988 U.S.Dist. LEXIS 521, at *7 (S.D.N.Y. Jan. 14, 1988) (rejecting privilege claim because attorney was acting in role of business adviser).

II. *Applicability of the Garner Doctrine to the Discovery of Otherwise Privileged Material in a Shareholder Class Action*

**\*11** Recapping our conclusions thus far, we have agreed with the general notion advanced by defendants that documents related to individual case reserves are protected from disclosure as work product and/or as attorney-client communications. However, based on our selective *in camera* review, we have disagreed with defendants' classification of which documents relate to individual as opposed to aggregate reserves. As a result, we concluded that defendants should release a large percentage of the documents in category one because they are more properly characterized as relating to aggregate reserves. We also found that the insurer-insured communications in category two were not protected by the attorney-client privilege, though we agreed that they could constitute work product. Finally, we de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG    Document 62-2    Filed 07/17/2008    Page 10 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 10

termined that documents with privilege numbers 1239, 1691, 1692, 1695, 1698, and 1704 satisfy the requirements of the attorney-client privilege, the sole basis on which the documents were withheld.

We now turn to the issue of whether we should order the otherwise privileged attorney-client communications to be produced on the basis of the *Garner* doctrine. We will pursue this inquiry in two stages. First we will explore whether the facts of this case parallel *Garner;* if so, we will proceed to examine whether plaintiffs have made a showing of good cause sufficient to warrant piercing the attorney-client privilege.

(1) Similarity of the Pfizer Securities Litigation to a *Garner* Situation

In the landmark case of *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970), *cert. denied,* 401 U.S. 974 (1971), the Fifth Circuit considered the question of whether shareholders in litigation against their corporation can discover otherwise privileged attorney-client communications on the basis of a showing of good cause. Noting that management does not manage for itself but ultimately for the benefit of its shareholders, the court refused to allow the corporation to hide behind the privilege: "[M]anagement judgment must stand on its merits, not behind the ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised." *Id.* at 1101. In what has become known as the *Garner* doctrine, the court wrote:

[W]here the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

*Id.* at 1103-04. The court then enumerated nine factors that support a finding of good cause.[FN8]

Courts have not limited *Garner* to one particular type of suit; rather, the doctrine has been steadily extended to encompass other fiduciary-type relationships. *See generally* Gergacz, *Attorney-Corporate Client Privilege* ¶ 6.03[1][b], at 6-15, -16; *Developments-Privileged Communications,* 98 Harv.L.Rev. 1450, 1524-29 (1985). Most courts apply the doctrine to derivative suits,[FN9] class actions,[FN10] and individual claims[FN11] all alike. Only the Ninth Circuit has limited *Garner* to the context of the shareholder derivative suit. *See Weil v. Investment/Indicators Research & Management,* 647 F.2d 18 (9th Cir.1981).

**\*12** The Ninth Circuit's view does possess a certain logic. In a class action the shareholders act on behalf of themselves and to the possible detriment of shareholders who do not belong to the class, whereas in a derivative action the shareholders act on behalf of the corporation.[FN12] Furthermore, we do find language in *Garner* that raises doubts as to its applicability to certain class actions. In particular, footnote seventeen in *Garner* reads as follows:

Due regard must be paid to the interests of nonparty stockholders, which may be affected by impinging on the privilege, sometimes injuriously (though not necessarily so-in some situations shareholders who are not plaintiffs may benefit). The corporation is vulnerable to suit by shareholders whose interests or intention may be inconsistent with those of other shareholders, even others constituting a majority.

*Id.* at 1101. On the other hand, *Garner* itself involved *both* a class action and a shareholder derivative suit, and in footnote eleven the Court wrote, "[O]ur decision does not turn on whether that claim [the derivative claim] is in the case or out." *Id.* at 1097.

In the recent decision of *In re Bairnco Corp. Sec. Lit.,* 148 F.R.D. 91 (S.D.N.Y.1993), Judge Connor of this Court followed the line of authority that applies *Garner* regardless of the type of suit filed in the case. "While *Garner* arose in the context of the shareholder derivative suit," noted Judge Connor,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 11 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 11

"nothing in the language or reasoning of *Garner* so limits its holding." *Id.* at 97. *Bairnco* suggested that the fact that stock value may fall as a consequence of an adverse judgment, thereby harming nonparty stockholders, does not bar application of the *Garner* doctrine. While "[a]pplicability of the *Garner* doctrine has typically rested on the existence of a fiduciary duty or mutuality of interest between the corporation and its shareholders at the time of the communication sought to be discovered," *id.* at 98, *Bairnco* extended *Garner* to apply to the situation where, as here, the plaintiff class includes investors who were not fiduciaries at the time of the allegedly fraudulent disclosure, but who later purchased the stock in reliance thereon.FN13

The instant case bears a strong similarity to the facts of the discovery dispute contested in *Bairnco* and to other *Garner* situations. Similar to this litigation against Pfizer, *Bairnco* involved a class action brought on behalf of investors who purchased common stock over a one-year period in reliance on allegedly fraudulent disclosures. Plaintiffs in *Bairnco* alleged that defendants violated certain securities laws-specifically, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder-by falsely claiming in public disclosures that then present and unasserted future claims for asbestos-related damages, and the cost of defending against such claims, would not have a materially adverse effect on the consolidated financial position of Bairnco and its subsidiaries. In an attempt to ascertain the veracity of Bairnco's public representations during the period in question, plaintiffs asked defendants to produce all communications from their attorneys concerning the prospects of any litigation against Bairnco or its subsidiaries over asbestos-related products or concerning the extent of the company's economic exposure therefrom. Defendants refused to produce eleven documents on the grounds of relevance and of attorney-client, joint defense, and work product privileges. Ruling for the plaintiffs, Judge Connor found the documents to be highly relevant and rejected the assertions of privilege on the basis of the *Garner* doctrine.

**\*13** Plaintiffs here request the same treatment as received by their counterparts in *Bairnco.* We agree that the main facts of the cases are analogous and that this is a situation where application of *Garner* is appropriate.FN14 Plaintiffs correctly note that the documents in dispute here were not prepared in anticipation of an action by shareholders for securities fraud. Rather, the documents all relate to defendants' exposure to tort plaintiffs in present and future personal injury suits stemming from failures of the mechanical heart valve. As in *Bairnco,* plaintiffs do not seek the documents in question in order to uncover the specific litigation strategies of Pfizer with respect to individual tort claimants. Rather, they seek the documents in order to ascertain whether Pfizer deliberately disguised the true extent of its financial exposure arising from defects in the mechanical heart valve-an issue that is at the heart of the underlying securities fraud action.

(2) Application of the *Garner* Good Cause Elements

Having decided that this is a *Garner* analog, we now turn to the question of whether plaintiffs have demonstrated good cause to abrogate the attorney-client privilege attached to the documents in question. We hold that they have not.

For simplicity of analysis, the nine *Garner* good cause factors can be grouped into four broad categories: (1) the discovering party's stake in the fiduciary relationship; (2) the apparent merit of the claim; (3) the need of the discovering party for the information; and (4) the nature of the communication itself. While the first and second categories clearly support plaintiffs' discovery demand, the third and fourth do not; consequently, we find that plaintiffs have not satisfied their *Garner* burden.

Plaintiffs have satisfied the good cause factors contained in categories one and two. With respect to the first category, it is clear that plaintiffs represent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 12 of 15

Not Reported in F.Supp.  
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)  
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

Page 12

a substantial percentage of both shareholders and shares. *Cf. E. Cohen v. Uniroyal, Inc.,* 80 F.R.D. 480, 484 (E.D.Pa.1978). In terms of the second category, that plaintiffs' underlying suit presents at least a colorable claim is established by Judge Keenan's December 21, 1990 denial of a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).

However, turning to the third category, we do not believe that plaintiffs have established sufficient need for the information contained in the otherwise privileged documents to warrant their discovery. Although the documents are specified and plaintiffs do not intend a fishing expedition, we do not accept that plaintiffs will have a serious need for the information in light of our reclassification of many formerly withheld documents into the category of non-privileged aggregate information. Finally, with respect to the fourth category, the revelation of documents containing individual reserve figures could unduly prejudice Pfizer in the underlying products liability cases.

**\*14** In so holding, we do not take issue with Judge Connor's general conclusion in *Bairnco* that, in certain circumstances, stock investors are entitled to pierce the attorney-client privilege in order to assess the adequacy and veracity of the company's public posture regarding the financial impact of foreseeable litigation. As the court aptly noted in *Bairnco:*

Information given to Keene [a Bairnco subsidiary] concerning Keene's asbestos liability should be highly revealing as to the veracity and sufficiency of Keene's public disclosures concerning its economic exposure and, perhaps more importantly, particularly probative of Keene's good or bad faith in making such disclosures. Keene's views as to its litigation prospects were surely informed by, if not wholly dependent upon, the information and advice provided by counsel. If Keene's public statements were in conflict with the opinions it received from its counsel, this would be highly relevant evidence on the issue of Keene's scienter.

Similarly, in the present case, we agree that documents containing statistical summaries of present and pending claims are relevant because they indicate the nature and probable financial impact of heart valve litigation on Pfizer. This information has a direct bearing on whether Pfizer recognized, but failed to adequately disclose, the quantity of expected litigation. Indeed, we have already directed defendants to produce those documents on the ground that they contain business information not protected by attorney-client privilege. Accordingly, without disagreeing with the rationale of *Bairnco* or *Garner,* we do not find cause to abrogate the attorney-client privilege attached to documents describing individual case reserves.

### (3) Application of the *Garner* Doctrine to Work Product

The few federal courts that have faced the issue have refused to extend the *Garner* doctrine to work product, and we see no reason to depart from those precedents. *See In re International Sys.,* 693 F.2d 1235, 1239 (5th Cir.1982); *In re Dayco Corp.,* 99 F.R.D. 616, 620 (S.D.Ohio 1983); *Donovan v. Fitzsimmons,* 90 F.R.D. 583, 587 (N.D.Ill.1981). Unlike the attorney-client privilege, which serves only the client's interest, the work product privilege also operates to protect *counsel* from unfair and intrusive disclosure. As one court has explained:

The *Garner* rule forecloses the use of attorney-client privilege, itself intended for the ultimate benefit of the *client,* to prevent disclosure of a breach of the client's trust. Shareholders or beneficiaries, however, do not stand in the same position with respect to the *attorney,* for whom the work product rule is designed to benefit, as they do to their own trustees. And as a result, the *Garner* analysis cannot be readily applied to defeat the work product rule.

*Donovan,* 90 F.R.D. at 588. Furthermore, because the discovering party may overcome the privilege for ordinary work product by demonstrating "substantial need" and "undue hardship," work

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 13 of 15

Not Reported in F.Supp.                                                                                                 Page 13
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

product already has its own version of the good cause exception. We therefore will now look to whether the "substantial need" and "undue hardship" exception is applicable in the circumstances of this case.

III. *"Substantial Need and Undue Hardship" Exception to Work Product*

**\*15** Rule 26(b)(3) of the Federal Rules of Civil Procedure allows a court to order the production of ordinary work product in cases where "the party seeking discovery has substantial need of the materials in the preparation of his case" and is "unable without undue hardship to obtain the substantial equivalent of the materials by other means." *See Upjohn Co. v. United States,* 449 U.S. 383, 400 (1981). Plaintiffs claim that even if the work product privilege does attach to the documents at issue here, they are nonetheless entitled to their production on the basis of this exception. Plaintiffs contend that the documents are unavailable elsewhere and that they provide the only basis for analyzing Pfizer's method of calculating reserves.

We do not believe that the documents describing individual case reserves are ordinary work product. Rather, they are examples of opinion work product, reflecting the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning litigation." Fed.R.Civ.P. 26(b)(3). In deference to the adversary system's desire to maintain the secrecy of an attorney's thought processes, opinion work product is entitled to nearly absolute protection. *See Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir.1985). Consequently, these documents are protected from disclosure.

CONCLUSION

For the reasons stated above, the motion to compel production is granted in part and denied in part.FN15

IT IS SO ORDERED.

FN1. This dispute was referred to us by Judge Sonia Sotomayor, to whom the case is assigned, in an Order dated February 5, 1993 for the purposes of determining (1) whether and, if so, to what extent, plaintiffs' motion to compel should be granted, and (2) what further discovery, including deposition discovery, shall be permitted on the documents that are herein ordered to be produced and in the case in general. In addition, Judge Sotomayor directed defendants to provide plaintiffs with a more detailed description of the 3,397 documents then in dispute. Subsequently, on June 11, 1993, the parties agreed to narrow the scope of the dispute to the current 1219 documents. On June 15, 1993, plaintiffs submitted a letter brief in support of their motion to compel. Defendants responded with an answering memorandum of law dated August 6, 1993. Plaintiffs then filed a reply memorandum on August 23, 1993.

FN2. For a sample of the discussion and debate, *see, e.g.,* John W. Gergacz, *Attorney-Corporate Client Privilege* ¶¶ 6.01-.04, 7.02[f] (1990 & Supp.); Steven M. Abramowitz, *Disclosure Under the Securities Laws: Implications for the Attorney-Client Privilege,* 90 Colum.L.Rev. 456, 479-88 (1990); Stephen A. Saltzburg, *Corporate Attorney-Client Privilege in Shareholder Litigation and Similar Cases: Garner Revisited,* 12 Hofstra L.Rev. 817 (1984); Note, *The Attorney-Client Privilege in Class Actions: Fashioning an Exception to Promote Adequacy of Representation,* 97 Harv.L.Rev. 947 (1984).

FN3. In making the rulings herein, we have assumed that documents listing historic settlement figures for individual cases have been maintained in a confidential

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

manner by defendants and that the information reflected therein is not publicly available. If these assumptions are incorrect, counsel for defendants should inform us forthwith.

FN4. We believe that the distinction between individual case reserve and aggregate case reserve documents is a meaningful response to the parties' overly broad contentions as to which documents should be considered as ones prepared for the purpose of public reporting.

FN5. By way of illustration, documents numbered 42, 83, 150, 177, 253, 288, 312, 343, 408, 435, 499, 544, 568, 620, 642 (last page only), 672, 695, 716, 738, 761, 785, 811, 831, 852, 876, 910, 935, 1744, 1770, 1825 (pages two and three only), 1854, 1874, 1900, 1925, 1952, and 1983 reveal aggregate information. Documents numbered 22, 62, 128, 202, 222, 365, 468, 642 (first four pages only), 1217, 1452, 1513, 1722, 1794, and 1825 (first page only) disclose individual information.

FN6. Finally, it should be noted that even if a document is not entitled to attorney-client privilege status, that it is not subject to disclosure if it is independently entitled to work product protection.

FN7. Plaintiffs assert in footnote eight of their June 15, 1993 letter brief that category three includes documents labelled Priv. No. 1693 and 1694. However, these two documents are not listed on defendants' privilege log, nor were they included among the category three documents sent by defendants to the Court for *in camera* review. Thus, we have assumed that defendants no longer assert a claim of privilege as to them.

FN8. The factors are as follows: (1) the number of shareholders and the percentage of stock they represent; (2) the bona fides of the shareholders; (3) the nature of the shareholders' claim and whether it is obviously colorable; (4) the apparent necessity and desirability of the shareholders having the information and the availability of it from other sources; (5) whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; (6) whether the communication related to past or to prospective actions; (7) whether the communication is of advice concerning the litigation itself; (8) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; (9) the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. *Garner,* 430 F.2d at 1104.

FN9. *See, e.g., In re International Sys.,* 693 F.2d 1235 (5th Cir.1982); *In re Trans-Ocean Tender Offer Sec. Litig.,* 78 F.R.D. 692 (N.D.Ill.1978).

FN10. *See, e.g., In re LTV Sec. Litig.,* 89 F.R.D. 595 (N.D.Tex.1981); *Panter v. Marshall Field,* 80 F.R.D. 718 (N.D.Ill.1978); *E. Cohen v. Uniroyal,* 80 F.R.D. 480 (E.D.Pa.1978).

FN11. *See, e.g., Quintel v. Citibank,* 567 F.Supp. 1357 (S.D.N.Y.1983).

FN12. We recognize that this is a somewhat idealized description of the nature of a derivative suit. Often times, the derivative suit is designed to enhance the wealth of the plaintiffs, or the plaintiffs' attorneys, and not the company's equity-holders in general. *See* John C. Coffee, *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private En-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-04137-BSJ-GWG   Document 62-2   Filed 07/17/2008   Page 15 of 15

Not Reported in F.Supp. Page 15
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.))**

*forcement of Law Through Class and Derivative Actions,* 86 Colum.L.Rev. 669 (1986). Just as in a class action, the stockholders bringing the derivative suit may very well have their own idiosyncratic or highly personal motives. This reality argues against treating derivative suits differently from class actions for purposes of applying the *Garner* doctrine.

FN13. Two other cases have also applied *Garner* without a fiduciary relationship present between the parties. Like *Bairnco,* both involved investors who sought discovery of confidential documents from a company owing them a duty pursuant to the federal securities laws. These cases concluded that actual shareholders and investors who will soon become shareholders share a sufficiently close connection to warrant equal treatment under the *Garner* doctrine. See *In re LTV Securities Litigation,* 89 F.R.D. 595 (N.D.Tex.1981); *E. Cohen v. Uniroyal,* 80 F.R.D. 480 (E.D.Pa.1978).

FN14. For the sake of clarity, we should note that certain aspects of the reasoning in *Bairnco* are not applicable to the case at bar. For example, as alternative grounds for ordering production of the eleven documents there in dispute, Judge Connor relied upon the potential applicability of (1) an advice of counsel defense (even though the defendants represented that they had no intention of raising the argument), and (2) the crime-fraud exception to the attorney-client privilege (even though the plaintiffs did not allege criminal or fraudulent conduct). In the instant suit, we see no reason to doubt defendants' representation that they will not be raising an advice of counsel defense. Furthermore, plaintiffs have not alleged, nor do the facts themselves so suggest, that the documents in dispute were in furtherance of the perpetuation or attempted perpetration of a crime or fraud.

FN15. If the parties continue to disagree over which of the withheld documents should be produced, they should present the disputes to this Court by reference both to the specific language in this Memorandum and Order and the related document on the privilege list.

S.D.N.Y.,1993.
In re Pfizer Inc. Securities Litigation
Not Reported in F.Supp., 1993 WL 561125 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.