Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 617983 (S.D.N.Y.)
**(Cite as: 2006 WL 617983 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CSI INVESTMENT PARTNERS II, L.P., et al.,
Plaintiffs,
v.
CENDANT CORPORATION, et al., Defendants.
**No. 00 Civ. 1422(DAB)(DF.**

March 13, 2006.

*MEMORANDUM AND ORDER*

EATON, Magistrate J.

 **\*1** Cendant Corporation has asserted five counterclaims. In connection with the Second Counterclaim, Cendant alleges as follows. In Section 8.1 of the 4/10/98 Stock Purchase Agreement, the Counter-Defendant Sellers agreed to "jointly and severally indemnify and hold harmless Cendant ... against any and all [loss or liability] arising from ... any breach or inaccuracy of any representation or warranty of the Company [Credentials] contained in [the Stock Purchase Agreement." Cendant claims that the Sellers breached two warranties:

> In Section 3.1(p), Credentials warranted that it "is not ... in default in any material respect under" a contract between Credentials and TRW-Experian. However, on May 21, 1998, TRW-Experian wrote to Cendant that the contract's requirement of "written" consent from customers was being violated by Credentials' telemarketing practice of obtaining consent orally (even though tape-recorded). In response, Cendant changed the Credentials practice, made it congruent with CUC's historical practices, and completed that change by September 1998.
> In Section 3.1(f), Credentials warranted that it "is, and has been, in compliance in all material respects with all applicable laws." However, on June 15, 1998, Cendant was served with a class-action lawsuit, *Frerichs v. Credentials et al.,* which alleged that this same practice of Credentials had been violating the Fair Credit Reporting Act. In response, Cendant paid a settlement that, combined with its legal fees, cost more than $1 million.

The Counter-Defendant Sellers maintain as follows: TRW-Experian's legal view was erroneous, and so was Cendant's decision to change Credentials' telemarketing practice, and the change was one of several reasons why the Credentials business suffered and did not provide the earn-out bonus for performance through December 31, 1998. The Sellers also maintain that the *Frerichs* class action lacked merit; they declined to assume the defense, but they say that Cendant ought to have been able to obtain a dismissal and ought to have spent less on legal fees.

In the First Counterclaim, Cendant makes the same allegations but seeks broader damages under the rubric of common law fraud. The First Counterclaim would require Cendant to prove that it justifiably relied on the representations. Therefore, according to the Sellers, Cendant has placed "at issue" Cendant's knowledge and belief concerning the legal issues as to whether Credentials' telemarketing practice complied with the TRW-Experian contract and with the Fair Credit Reporting Act.

The Sellers (Plaintiffs) sought all documents concerning advice and opinions given to Cendant or CUC by any attorney on those legal issues. (Pls. 6/15/05 Document Requests 3-15.) In my 11/16/05 Memorandum and Order, at pp. 5-6, I directed the Defendants to serve a complete privilege log; they have done so. I also directed the Plaintiffs "to serve a draft of a joint letter limited solely to the disputes [concerning Requests 3-15], with discussion of the case law on the scope of 'at issue' waiver of privilege."

 **\*2** Plaintiffs waited until February 6, 2006 to serve the draft. Defendants responded on February 17, after a 3-day extension granted by Plaintiffs. On February 24, Plaintiffs made additions and served their next draft; by that time, it was apparently more than 30 pages long.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Four business days later, Defendants requested an extension until March 9. Plaintiffs became impatient. On March 8, Plaintiffs stripped out all of Defendants' arguments and sent a messenger to deliver to me a non-joint letter containing only Plaintiff's arguments (22 pages) and only Plaintiffs' exhibits (Exhs.1-41). Before it arrived, defense counsel and I learned about it, during the course of a March 8 telephone conference on a different issue. I directed defense counsel to send me the draft joint letter as it then stood; they sent me a fax copy that night, and delivered it the next day. Dated March 9, it contains 43 pages plus Defendants' Exhs. A-L; even though it is signed only by defense counsel, I accept it (together with Pls. Exhs. 1-41) as Joint Letter 7. Pursuant to my normal practice, I will hold this letter in my chambers file and it will not be docketed in the court file.

Defendants state their position quite clearly (with my emphasis in bold type):

> In this case, Cendant has waived attorney-client protection for communications concerning the use of verbal authorization for any of Cendant's credit monitoring businesses prior to April 10, 1998. Post-Transaction legal advice through 1998 concerning the use of verbal authorization has also been waived so long as it concerns the sale or operation of Credentials. The waiver is limited to the use of "verbal authorization" because it is the only known means by which Credentials violated the FCRA (and the Experian contract).... The waiver [does not extend beyond Dec. 31,] 1998 because Cendant's pecuniary obligations to Sellers expired at the end of 1998, among other reasons.... [Cendant] has produced all material within the scope of its waiver.

(Joint Letter 7, p. 3.)

Plaintiffs, at p. 31, point to one sentence in *Bank Brussels Lambert v. Credit Lyonnais,* 1995 WL 598971, *3 (S.D.N.Y. Oct. 11, 1995)* (Francis, M.J.): "Once the waiver is created, parties may not limit the waiver temporally." Read in isolation, this one sentence is overbroad. But Judge Francis promptly proceeded to explain why the later legal opinions were relevant on the facts of that case. Two years later, Judge Grubin quoted that sentence but prefaced it with the word "Generally." *Kidder Peabody & Co. Inc. v. IAG Int'l Acceptance Group,* 1997 WL 272405, *5 (S.D.N.Y. May 21, 1997)*. More recently, Judge Leval acknowledged that "we have sometimes used broad language in describing the doctrine," but emphasized:

> ... [B]ecause the doctrine is rooted in fairness we have also cautioned against broad generalizations, stressing that "[w]hether fairness requires disclosure ... is best decided on a case by case basis, and depends upon the specific context in which the privilege is asserted."

**\*3** *John Doe Co. v. United States,* 350 F.3d 299, 302 (2d Cir.2003).

In the case at bar, I find Defendants' position to be fair. I shall now discuss Plaintiffs' arguments for a broader waiver. To persuade a Court to find an "implied waiver" or "forfeiture" of the attorney-client privilege, the moving party must prove that: "(1) the very subject of privileged communications was critically relevant to the issue to be litigated; (2) there was a good faith basis for believing such essential privileged communications existed; and (3) there was no other source of direct proof on the issue." *Allen v. West Point-Pepperell Inc.,* 848 F.Supp. 423, 429 (S.D.N.Y.1994) (Schwartz, J.) (with my emphasis in bold type).

Plaintiffs assert that they need to know about legal advice given to CUC and to Cendant; Plaintiffs say it is critically relevant because the First Counterclaim raises the issue of whether Cendant actually relied on the Sellers' representations. But Plaintiffs have no retort to the words of Judge Grubin in another case:

> ... Whatever advice, right or wrong, that Ayala received from its attorneys concerning the need for a written agreement, and whether or not Ayala disregarded its attorneys' advice, are irrelevant to the issue of whether Ayala actually relied on SCB's oral representations. I fail to see how any privileged legal *opinion* rendered by Pettit & Martin can bear upon the issue of whether Ayala actually did rely on SCB's statements and whether, as a matter of law, it was entitled to so rely based on all the facts known to it. Information on the former question can be obtained from Ayala, and the latter question is to be determined by pro-

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 617983 (S.D.N.Y.)
**(Cite as: 2006 WL 617983 (S.D.N.Y.))**

Case 1:07-cv-04137-BSJ-GWG    Document 87-3    Filed 09/09/2008    Page 3 of 5

ceedings in this court, not by the opinion of Ayala's lawyers.

*Standard Chartered Bank v. Ayala International Holdings,* 111 F .R.D. 76, 82 (S.D.N.Y.1986), quoted with approval by Judge Schwartz in *Allen,* 848 F.Supp. at 430, and by Judge Sweet in *Paramount Communications v. Donaghy,* 858 F.Supp. 391, 396 (S.D.N.Y.1994). Hence, the legal advice given to CUC and to Cendant is not "critically relevant."

Nevertheless, in response to Plaintiffs' demands, Defendants agreed to supply discovery of all pre-Aquisition attorney-client communications concerning the use of verbal authorization. On this topic, the pre-Aquisition discovery has been skimpy, but it has been very valuable in Plaintiffs' estimation. Last year, Cendant produced the daily notes of Leslie Hyman from the days when she was employed by CUC and then Cendant. One of those notes is Bates-stamped as LH 000678. She acknowledged that it was written by her on May 18, 1997; its last six lines read:

```
incorporated all contract [defense]s
FRCA--                                              Ask
   used Mr. Shelly Feldman     co-author of    Bob Peck
                               orig & new FCRA to look
to OK telecomm recording                       under
         anything that cld be confirmed        S. Feldman
                                                  file
```

She testified that she could not recall who made those statements to her. Cendant says that it has been unable to determine whether CUC maintained a "Shelly Feldman file" in 1997. On the other hand, Sheldon Feldman testified as follows. He was an attorney with the Federal Trade Commission when the Federal Credit Reporting Act was enacted, and then he was an attorney with Weil Gotshal & Manges from 1975 to 2000. He does not recall which client, if any, asked him for advice on the subject of whether a voice recording constituted a "writing" under the Act, and he did not think it was CUC, but he says "I have a recollection that I dealt with the subject matter." (Pls. Exh. 8 at Tr. 84-85.) In short, Plaintiffs already have evidence from which they infer that the Private Line business of CUC possessed a legal opinion in 1997 that a voice recording would be "OK" under the Act.

 ***4** On the other hand, Cendant produced a June 8, 1998 e-mail by in-house attorney Jennifer Taub opining that the FRCA requires written permission. (Pls.Exh. 28.) The evidence enables Plaintiffs to argue that CUC/Cendant changed its view because of the April 10, 1998 acquisition of Credentials. The evidence enables Defendants to argue that Taub was expressing not just Cendant's view but also Experian's view (which had been conveyed to Cendant in a May 1998 e-mail).

Furthermore, Defendants agreed to supply discovery of all such communications for April 10, 1998 through December 31, 1998, so long as the communication "concerns the sale or operation of Credentials ." I find this to be a sensible compromise. During those 8 1/2 months, because of the earn-out, Plaintiffs had an interest in the Credentials division. But I see no reason entitling them to learn about attorney-client communications concerning other divisions of Cendant. This aspect of Plaintiffs' demand seems to have very attenuated relevance, especially in view of Plaintiffs' statement at page 2 of Joint Letter 7:

> At the time of the Acquisition, Credentials primarily used a one-step fulfillment process for its telemarketing memberships while [the pertinent divisions of] Cendant primarily used a two-step fulfillment process.... In the two-step fulfillment process, the telemarketing representative processed the membership

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

order and sent a fulfillment package to the member, which contained a request form which the member had to sign and return in order to receive his or her credit report....

At page 32 of Joint Letter 7, Plaintiffs note that Cendant produced "numerous" attorney-client documents for that 8 1/2-month period, but Plaintiffs express suspicions about Cendant's limiting its waiver for that period to communications concerning "the sale or operation of Credentials." Specifically, they complain about the redaction of Exh. 39, a memo to Henry Silverman that is undated but evidently was written in the summer of 1998. On March 10, 2006, through my law clerk, I directed Cendant to fax me the unredacted memo; I reviewed it *in camera* and saw that five lines were redacted. The redaction did not eliminate anything harmful to Defendants or helpful to Plaintiffs.

To summarize, Plaintiffs fail to show that they have been deprived of "direct proof," prior to the 12/31/98 end of the earn-out, concerning the issue of voice-recorded permission.

Plaintiffs ask me to compel Defendants to produce discovery concerning attorney-client communications from January 1, 1999 until the date when Defendants formally served their Counterclaims. I decline to do so. Plaintiffs are particularly interested in an opinion letter dated January 8, 1999 from Sheldon Feldman to Patricia Schoor-Rube, an in-house attorney at Cendant Interactive Services, Inc. Judge Batts heard oral argument about this letter (7/7/05 Tr. 25-31), then reviewed it *in camera,* and on August 4, 2005 issued a one-sentence order that "Defendants need not turn it over to Plaintiffs."

**\*5** In Joint Letter 7, p. 38, fn. 39, "Defendants hereby stipulate that Mr. Feldman's advice in 1999 did concern the subject matter of the FCRA, and the subject matter of the internet." At p. 23, including fn. 26, Plaintiffs say that the following "is evident by inference from Feldman's deposition testimony": "on January 8, 1999, Sheldon Feldman issued an opinion to Cendant stating that it was permissible to deliver credit reports to customers over the internet based on a mouse click, and without obtaining the customer's handwritten signature, because the customer's assent could be stored and confirmed." Even if I assume this to be correct, there are various differences between (a) a mouse click on the internet and (b) a voice recording of a telephone call; it is my understanding that only the latter practice was the subject of the May 1998 condemnation from TRW-Experian. Nevertheless, Plaintiffs want to see Mr. Feldman's 1999 legal research and to see whether he expressed an opinion free from doubt. I rule that Plaintiffs are not entitled to see this information.

I have obtained a copy of Mr. Feldman's letter from Judge Batts's chambers. Plaintiffs complain (at p. 23) that "Cendant has professed to be unable to find anyone who can even testify as to whether, prior to 2000, Cendant delivered credit reports to customers over the internet without first obtaining a handwritten signature." I will state that the January 8, 1999 letter talks of this only as a "proposal."

At pages 42-43 of Joint Letter 7, in unnumbered bullet points, Plaintiffs list 15 requests for relief. I deem them to be labeled as Points 1 through 15. I hereby rule on them as follows.

Points 1 through 4, 8 through 11, and 13 through 15: Denied.

Point 5: Denied pursuant to my understanding that Defendants have produced all documents responsive to Plaintiffs' Eighth Document Request (items 3, 4 and 5) except for withholding and redacting performed in strict conformity with Defendants' limited-waiver position as set forth at page 3 of Joint Letter 7 (quoted at pp. 2-3 of this Memorandum and Order).

Point 6: Defendants' position included the following: "The waiver is limited to the use of "verbal authorization" because it is the only known means by which Credentials violated the FCRA (and the Experian contract)." In an attempt to broaden the waiver to analogous subject matters, Plaintiffs served a subpoena on Cendant dated January 10, 2006. It asks for "All documents containing, concerning, or reflecting any opinions or advice provided by any attorney to Ideon, SafeCard, CUC, Cendant, and/or Trilegiant concerning any one or more

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of the following subjects: ..." The last subject is "(g) the use of verbal authorization and/or voice recordings to access or release consumer credit reports." I uphold subject "g," and I direct Cendant to produce all responsive documents, except for withholding and redacting performed in strict conformity with Defendants' limited-waiver position as set forth at page 3 of Joint Letter 7. I decline to enforce the subpoena with respect to subjects "a" through "f," which seek attorney communications concerning analogous subject matters even where the communications do not concern subject "g." In addition to the respect deservedly accorded to the attorney-client privilege, I find, pursuant to Fed.R.Civ.P. 26(b)(2)(iii), that "the burden or expense of the proposed discovery outweighs its likely benefit."

 **\*6** Points 5, 6, 7 and 12: Point 12 refers to "all documents responsive to any of the foregoing discovery requests [Points 1 through 11]," but I limit Point 12 to the discovery requests in Points 5, 6 and 7 as further limited by my discussions of Points 5, 6 and 7. Plaintiffs aptly quote from ***MTB Bank v. Federal Armored Express, Inc.,* 1998 WL 43125, \*4 (S.D.N.Y. Feb. 2, 1998)** (Sand, J.): "**Under Fed.R.Civ.P. 34, which governs the production of documents during discovery, the clear rule is that documents in the possession of a party's current or former counsel are deemed to be within that party's possession, custody or control**." Accordingly, I direct Defendants to use their best efforts to cause all present and former counsel of Ideon, SafeCard, CUC, Cendant and Trilegiant to produce, by March 20, 2006, all documents responsive to Points 5, 6, and 7, except for withholding and redacting performed in strict conformity with Defendants' limited-waiver position set forth at page 3 of Joint Letter 7. Cendant says that Weil Gotshal wishes to withhold or redact some additional documents for Weil Gotshal's own reasons. I will not uphold generalized objections from Weil Gotshal or any other present or former counsel. As to Points 5, 6, and 7, I will give Weil Gotshal until March 20, 2006 (and any other present or former counsel until March 30, 2006) to send (to me and to Plaintiffs) an itemized log clearly explaining the reasons why they seek to withhold or redact any document that would have to be produced in conformity with Defendants' limited-waiver position set forth at page 3 of Joint Letter 7.

I apply the same principles to Plaintiffs. In Joint Letter 7, at fn. 22 (repeated at fn. 42), Defendants make the following point. In late 1997, Credentials' auditors, Coopers & Lybrand, LLP (or its successor in interest) performed a valuation of Credentials that allegedly estimated Credentials' value in December 1997 to be well below the $170 million valuation done in the Summer of 1997. Defendants say they believe that Coopers' successor in interest still performs services for certain of the Plaintiffs in the case at bar, and yet Plaintiffs refuse to cause Coopers' successor to produce all documents concerning valuation of Credentials in 1997 and/or 1998. Plaintiffs do not deny this; at fn. 18, they weakly claim that auditors are different from legal counsel. If anything, the difference cuts against Plaintiffs. I find that documents in the possession of Coopers' successor are in Plaintiffs' "control" within the meaning of Fed.R.Civ.P. 34(a). I direct Plaintiffs to use their best efforts to cause Coopers' successor to produce, by March 20, 2006, all documents concerning valuation of Credentials in 1997 and/or 1998.

Finally, I direct Plaintiffs to serve, by March 14, 2006, an itemized privilege log, in compliance with our Court's Local Civil Rule 26.2, explaining the reasons why they seek to withhold or redact any document responsive to Defendants' discovery requests.

Not Reported in F.Supp.2d, 2006 WL 617983 (S.D.N.Y.)

END OF DOCUMENT